Andrea Zaccardi (ISB # 8818)
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

Kristine M. Akland (MTB # 37818)
*pro hac vice admission pending*
Center for Biological Diversity
P.O. Box 7274
Missoula, MT 59807
(406) 544-9863
kakland@biologicaldiversity.org

Margaret E. Townsend (OSB # 144463)
*pro hac vice admission pending*
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
(971) 971-6409
mtownsend@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological Diversity and Idaho Conservation League*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
NORTHERN DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and IDAHO CONSERVATION LEAGUE,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. FISH AND WILDLIFE SERVICE and U.S. ARMY CORPS OF ENGINEERS,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

1

## INTRODUCTION

1.      In this civil action for injunctive and declaratory relief, Plaintiffs Center for Biological Diversity ("Center") and Idaho Conservation League ("ICL") challenge Defendants U.S. Fish and Wildlife Service's ("Service") and U.S. Army Corps of Engineers' ("Corps") authorization of the Idaho-Club Lakeside Marina Development ("Project"). Specifically, the Center and ICL challenge (1) the Service's flawed and unlawful determination that the Project will not jeopardize the continued existence of bull trout (*Salvelinus confluentus*)—a species threatened with extinction under the Endangered Species Act ("ESA")—and/or destroy or adversely modify bull trout critical habitat, and (2) the Corps' failure to prepare a supplemental environmental assessment, in violation of the National Environmental Policy Act ("NEPA").

2.      As proposed, the Project plans to construct luxury homes and an enlarged marina at the mouth of Trestle Creek—a keystone spawning stream for bull trout—on Lake Pend Oreille in Bonner County, Idaho. In addition, the Project plans to alter the area around the mouth of Trestle Creek; reroute the North Branch of Trestle Creek ("North Branch"), which bull trout use for migration, rearing, and foraging; utilize electrofishing to remove bull trout from the North Branch; and conduct other, unspecified activities in the North Branch and in Trestle Creek.

3.      Trestle Creek and Lake Pend Oreille are designated critical habitat for bull trout. Trestle Creek is considered one of the most important bull trout spawning streams in the Pacific Northwest, having among the highest number of documented bull trout nests—or redds—in all of Lake Pend Oreille's tributaries. Bull trout migrate between the lake and Trestle Creek multiple times in their lifetime to spawn, and juvenile bull trout rear in the stream before out-migrating to the lake. The Service has determined that protection of this area is critical to the survival and recovery of bull trout.

4.     The Corps issued a Clean Water Act permit to construct the Project within critical habitat for bull trout and consulted with the Service pursuant to section 7 of the ESA. 16 U.S.C. § 1536(a)(2). After Plaintiffs sent a Notice of Intent to Sue under the ESA in 2021, the Corps suspended its Clean Water Act permit for the Project pending completion of the Agencies' reinitiated consultation under section 7 of the ESA for the Project's impacts on bull trout.

5.     The Service concluded that the Project will "take" bull trout—including by wounding, capturing, and killing some members of the species—and have long-term negative effects to some of the species' designated critical habitat, but nevertheless concluded that the Project will not jeopardize the continued existence of bull trout or adversely modify critical habitat, *i.e.*, a "no jeopardy" determination.

6.     The Service's "no jeopardy" determination for the Project is unlawful because the agency failed to provide a lawful cumulative effects analysis that considered the effects of the private residential development and other major aspects of the Project that have already been completed, failed to provide a detailed discussion of the effects of the entire agency action, and improperly relied on mitigation measures that are not reasonably certain to occur or even described. Thus, the Service's no jeopardy determination is arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with the law, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"), and the ESA, 16 U.S.C. §§ 1531-1544.

7.     Now that the Service's review is complete, the Corps may lift the suspension of the permit at any time, thereby allowing Project construction in bull trout critical habitat to begin immediately.

8.     As of the filing of this complaint, the Corps has failed to consider new information showing impacts to bull trout that were not previously considered or included in its

3

initial environmental assessment, including that the Project will cause lethal take of bull trout.

Thus, because new information shows that the Project will significantly affect the quality of the

environment in a manner that the Corps did not previously consider, the Corps' failure to prepare

a supplemental NEPA analysis violates NEPA, 42 U.S.C. §§ 4321-4370h, and the APA because

it constitutes agency action unlawfully withheld and unreasonably delayed, 5 U.S.C. § 706(1),

and/or agency action that is arbitrary and capricious and not in accordance with law and in

contravention of procedure required by law, 5 U.S.C. § 706(2).

9.      Plaintiffs seek declaratory and injunctive relief for these legal violations.

## JURISDICTION AND VENUE

10.     This action arises under the laws of the United States and involves the United

States as a Defendant. Plaintiffs bring this action under the ESA, 16 U.S.C. § 1540, and the APA,

5 U.S.C. §§ 706(1), (2).

11.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331

(federal question) and actions arising under the ESA and the citizen suit provision of the ESA, 16

U.S.C. §§ 1540(c), (g)(1)(c), and may issue declaratory judgment and further relief pursuant to

28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706.

12.     Venue is proper in this District pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28

U.S.C. § 1391(e) because the violations alleged in this Complaint occurred in this District.

Venue is proper in the Northern Division of this District because the harms alleged in this

Complaint arise in Bonner County. *See* Local Civ. R. 3.1.

## PARTIES

13.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a nonprofit organization

dedicated to the protection and restoration of biodiversity. The Center is based in Tucson,

Arizona, with staff and offices throughout the country, including in Idaho. The Center has more than 84,000 members, including many who live near bull trout critical habitat in Idaho and have an interest in bull trout. Because the Center values bull trout and bull trout critical habitat, the Center places high priority on protecting and recovering this species across its range. The Center works toward this goal through education, advocacy, scientific study, and litigation.

14.    Plaintiff IDAHO CONSERVATION LEAGUE is a nonprofit organization devoted to protecting Idaho's environment. ICL is based in Boise, Idaho with staff and offices in Ketchum, Sandpoint, and McCall, Idaho. ICL has more than 11,000 members, including many who live near, work with, and visit bull trout critical habitat and many who have an interest in protecting and recovering bull trout. ICL has worked to protect bull trout and bull trout critical habitat in the past through education, advocacy, litigation, and monitoring.

15.    All Plaintiffs have long-standing interests in the preservation and recovery of bull trout in Idaho, both because they and their members place a high value on the species and because the presence of bull trout is essential to the healthy functioning of the ecosystem. Plaintiffs have been active in seeking to protect and recover bull trout through a wide array of actions, including public outreach and education, scientific analysis, and advocacy intended to promote achievement of healthy ecosystem functioning in the region.

16.    Plaintiffs' members use Trestle Creek and the North Branch for traditional activities and recreational pursuits, including hiking, camping, wildlife viewing, and aesthetic enjoyment. Plaintiffs' members also use Trestle Creek and the North Branch to help educate young naturalists about bull trout and its habitat. In doing so, Plaintiffs' members and staff seek to observe, photograph, and study bull trout in their native habitat. Plaintiffs derive aesthetic recreational, scientific, inspirational, and other benefits from these activities.

17.    For example, Whitney Palmer, a Center employee who is also a member of both the Center and ICL, regularly visits Trestle Creek and the inlet area of Lake Pend Oreille where the North Branch outflows into the lake to observe and study bull trout, especially during spawning. Ms. Palmer regularly visits the area to enjoy the current scenic, unspoiled, natural values and to seek out, observe, and photograph wildlife including bull trout. This year, Ms. Palmer has visited the location twice to enjoy the area, paddleboard, observe wildlife, and look for bull trout. Ms. Palmer plans to visit Trestle Creek and the North Branch and enjoy the area and observe bull trout throughout the fall and into the winter. Specifically, she plans to go there on September 15, 2022 with local school children to witness bull trout spawning in Trestle Creek and help educate young people about the importance of bull trout and the many threats that the species faces. Ms. Palmer's ability to enjoy and observe bull trout and bull trout critical habitat will be irreparably harmed by the permit authorization and the Project.

18.    An actual controversy exists between Plaintiffs and Defendants. Plaintiffs' members use and enjoy Trestle Creek, the North Branch, and the Project area for observing spawning bull trout, paddleboarding, hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area frequently and on an ongoing basis in the future.

19.    The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under law. The requested relief would redress these injuries, and this Court has the authority to grant Plaintiffs' requested relief.

20.    Defendant U.S. FISH AND WILDLIFE SERVICE is an administrative agency within the U.S. Department of the Interior and is responsible for the conservation and recovery of wildlife species listed under the ESA, including bull trout.

21.    Defendant U.S. ARMY CORPS OF ENGINEERS is an administrative agency within the U.S. Department of Defense and is responsible for the lawful investigations, development and maintenance of the Nation's water and related environmental resources.

## LEGAL BACKGROUND

### I.    Endangered Species Act

22.    Congress enacted the ESA to provide a "program for the conservation of . . . endangered species and threatened species" and "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

23.    The Supreme Court has declared that the ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). As the Court recognized, "Congress intended endangered species be afforded the highest of priorities." *Id.* at 174.

24.    To these ends, section 7 of the ESA requires that all federal agencies work to recover listed species and contains both procedural and substantive requirements.

25.    Substantively, section 7 requires federal agencies to ensure that any action authorized, funded, or carried out by an agency is not likely to jeopardize the continued existence of any endangered or threatened species, or result in the destruction or adverse modification of critical habitat for such species. 16 U.S.C. § 1536(a)(2). To "jeopardize" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the

likelihood both survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

26.    To carry out the substantive duty to avoid jeopardy and destruction or adverse modification of critical habitat, section 7 also sets forth procedural requirements directing any agency proposing an action (*i.e.*, the "action agency") to consult with an expert agency—in this case, the Service—to evaluate the consequences of a proposed action on a listed species. *Id.*

27.    The action agency must first ask the Service whether any listed or proposed species may be present action area. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. If such species may be present, the action agency must prepare a "biological assessment" to determine whether the species may be affected by the proposed action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.

28.    A biological assessment must include, among other things, "[a]n analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies." 50 C.F.R. § 402.12(f)(4). In this context, the "cumulative effects" of the action are the "effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.* § 402.02.

29.    After completing the biological assessment, if the action agency determines that the action "may affect" but is "not likely to adversely affect" a listed species or its critical habitat, the regulations permit "informal consultation," during which the Service may concur in writing with the agency's determination. *Id.* § 402.14(a), (b). If the agency determines that the action is "likely to adversely affect" a listed species or critical habitat, or if the Service does not concur with the agency's "not likely to adversely affect" determination, the action agency must

engage in "formal consultation" with the Service, as outlined in 50 C.F.R. § 402.14. *Id.* §§ 402.02, 402.14(a).

30.     In formal consultation, after the Service evaluates the status of the listed species and the proposed action's effects on the species and its critical habitat using the best scientific and commercial data available, the Service issues a "biological opinion" that addresses "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species." 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.14(d), (g)(4).

31.     The Service's biological opinion must evaluate the direct, indirect, and cumulative effects of the proposed action within the action area and "add the effects of the action and cumulative effects to the environmental baseline in light of the status of the species." 50 C.F.R. § 402.14(g)(3)(4). The "environmental baseline" must include the past and present impacts of all federal actions and other human activities in the action area, including those that have already undergone consultation with the Service under section 7 of the ESA. *Id.* § 402.12. The "action area" includes "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." *Id.* § 402.02.

32.     If the Service concludes that an action will incidentally "take" a listed species but is not likely to jeopardize the continued existence of the species or result in the destruction or adverse modification of its critical habitat, the Service must provide an "incidental take statement." *Id.* § 402.14(g)(7). The incidental take statement must specify the amount or extent of the incidental taking on the listed species, set forth any "reasonable and prudent measures" that the Service considers necessary or appropriate to minimize such impact, and provide the "terms and conditions" that the action agency must comply with to implement those measures and avoid jeopardy to the species. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

33.     Take of a listed species without a valid incidental take statement is a violation of the ESA. 16 U.S.C. § 1538. The ESA defines "take" broadly to encompass all manner of harm and harassment, including direct injury or mortality and any acts or omissions that disrupt or impair significant behavioral patterns. *Id.* § 1532(19); 50 C.F.R. § 222.102

34.     The Corps' issuance of a Clean Water Act permit authorizing the deposition of dredge and fill material into waters of the United States is a federal agency action that requires consultation with the Service under section 7 of the ESA.

**II.     The National Environmental Policy Act**

35.     Congress enacted NEPA to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

36.     As a general matter, NEPA requires that federal agencies analyze and disclose to the public the environmental impacts of their actions. *Id*. § 4332(2)(C). To this end, the Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA, which, among other things, are intended to "ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a).

37.     To fulfill its mandates, NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. If an agency is uncertain whether it must prepare an EIS, it may prepare an environmental assessment ("EA") to determine whether the proposed action may have significant impacts requiring preparation of an EIS. 40 C.F.R. § 1501.5.

38.     In either an EA or EIS, NEPA requires that the action agency "succinctly describe the environment of the area(s) to be affected or created by the alternative under consideration." *Id.* § 1502.15. NEPA regulations also require the action agency to evaluate a reasonable range of alternatives including a "no action" alternative when analyzing environmental impacts of the proposed action. *Id.* § 1502.14.

39.     The action agency must set an appropriate baseline detailing the nature and extent of the resources in the area. *Id.* § 1502.15. "The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process." CEQ, *Considering Cumulative Effects under the National Environmental Policy Act* 41 (Jan. 1997).

40.     The action agency must also identify the direct, indirect, and cumulative impacts of each reasonable alternative to the action, including a project's ecological, aesthetic, economic, social, and health effects. 40 C.F.R. §§ 1508.7 (defining cumulative impact); 1508.8 (defining environmental effects); 1508.9(b) (requiring NEPA analyses to disclose the "environmental impacts of proposed action and alternatives"). Direct impacts are "caused by the action and . . . occur at the same time and place." *Id.* § 1508.8(a). Indirect impacts are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id*. § 1508.8(b).

41.     In the NEPA context, cumulative impacts are "the impact[s] on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions [and] can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

42.     An agency is required to prepare an EIS if substantial questions are raised as to whether a proposed action may significantly affect the quality of the human environment. In determining whether an EIS is required, an agency must consider what "significantly" means. NEPA regulations give it two components: context and intensity. *Id.* § 1508.27. Context refers to the setting in which the proposed action takes place; intensity means "the severity of the impact." *Id.* There are ten severity factors the agency must consider, *id.* § 1508.27, and just one of these factors may be sufficient to require a preparation of an EIS.

43.     Federal agencies have an ongoing duty under NEPA to issue supplemental environmental analysis when the agency "makes substantial changes in the proposed action that are relevant to environmental concerns"; or when "significant new circumstances or information" arise. 40 C.F.R. § 1502.9(c)(1)(i) and (ii).

## III.     The Clean Water Act

44.     The Clean Water Act was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251, and generally prohibits the discharge of pollutants into "waters of the United States," *id.* §§ 1311(a), 1362(7), which include the waters at issue here.

45.     The Corps is authorized to issue permits for otherwise unlawful discharges of "dredged or fill materials" but only if the proposed activity complies with stringent requirements set forth in regulations issued by the Corps and the U.S. Environmental Protection Agency. *Id.* § 1344.

46.     The Corps' regulations declare that wetlands and other U.S. waters "constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(1). In deciding

whether to allow activities to proceed under a CWA permit, the Corps engages in a "public interest review" that must encompass, among other effects, the extent to which water bodies will be harmed and the extent to which wildlife, including endangered species, will be impacted. *Id*. § 320.4(a).

**IV.    The Administrative Procedure Act**

47.    Because NEPA does not include a citizen suit provision, this case is also brought, in part, pursuant to the APA, which allows persons and organizations to challenge final agency actions in the federal courts. 5 U.S.C. §§ 551-559, 701-706.

48.    The APA declares that a court shall hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.* § 706(2)(A). An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The APA also requires a reviewing court to "compel an agency action unlawfully held or unreasonably delayed." 5 U.S.C. § 706(1).

<u>**FACTUAL ALLEGATIONS**</u>

**I.    Bull Trout (*Salvelinus confluentus*) Life History and Habitat Requirements**

48.    The bull trout is a type of char in the salmonid family native to waters of western North America. Its range includes the Columbia River and Snake River basins, extends east to headwater streams in Idaho and Montana, stretches north into Canada and southeast Alaska, and

encompasses the Puget Sound and Olympic Peninsula watersheds of western Washington and the

Klamath River basin of south-central Oregon.

49.    The bull trout is one of the most threatened salmonids. It has been nicknamed the

"grizzly bear of the fish world" due to its large size, fierce disposition, and reliance on pristine,

unspoiled cold-water habitat. *See, e.g.*, Montana Field Guide, Bull Trout – *Salvelinus*

*confluentus*, https://fieldguide.mt.gov/speciesDetail.aspx?elcode=AFCHA05020. Bull trout may

be found in the coldest, cleanest waters of high mountainous areas and primarily live in deep

pools of large, cold rivers and cold, clear lakes.

50.    Bull trout require specific habitat components, often referred to as "the four Cs":

cold, clean, complex, and connected habitat. They require cold water temperatures (less than 12

degrees Celsius/54 degrees Fahrenheit); the cleanest water and stream substrates; complex

stream habitat including deep pools, overhanging banks, and large woody debris; and

connectivity between spawning and rearing areas and downstream foraging, migration, and

overwintering habitats.

51.    Bull trout may be either resident or migratory. Resident bull trout complete their

entire life cycle in the same streams where they spawn and rear. Migratory bull trout spawn in

tributaries, where juveniles rear for up to five years before migrating either to a lake (adfluvial)

or, in coastal areas, to saltwater (anadromous). Resident and migratory bull trout may be found

together, and either form may spawn offspring exhibiting either resident or migratory behavior.

52.    Bull trout live longer than any other salmonid. Although maximum age is

unknown, bull trout have been recorded as old as 24 years old. Unlike Pacific salmon species

that spawn once and then die, bull trout will spawn multiple times in their lifetime, migrating

multiple times between spawning streams and their large river or lake habitats.

53.     Migratory bull trout may begin their spawning migration as early as April, and some travel upstream up to 250 kilometers (155 miles) to find suitable spawning habitat.

54.     Bull trout typically spawn between August and November but will not begin spawning until the water cools to specific temperatures. Bull trout construct their nests, or redds, in low-gradient stream reaches with loose, clean gravel substrates.

55.     Bull trout fry emerge from redds in early April through May, depending on stream temperatures and flows. Once hatched, young fry remain in the gravel substrate as long as ideal temperatures are maintained. Juvenile bull trout spend considerable time foraging and rearing in the creek where they were spawned until they grow to the optimal size for out-migration.

56.     Juvenile bull trout prey on terrestrial and aquatic insects, macro-zooplankton, and small fish. Adult bull trout are carnivorous, feeding primarily on a wide variety of fish species.

57.     Sedimentation, or the delivery of fine sediment to the streambed, reduces bull trout egg survival, fry emergence, and forage opportunities.

58.     The current distribution of bull trout is fragmented across its historical range. Bull trout occur in low numbers in many areas, and many populations are depressed, and declining.

## II.     Threatened Status of Bull Trout, Critical Habitat Designation, and Recovery Plan

59.     The Service listed bull trout in the coterminous United States as one distinct population segment that is threatened with extinction under the ESA in 1999. 64 Fed. Reg. 58,910 (Nov. 1, 1999).

60.     The Service determined that bull trout are threatened by the combined effects of: (1) habitat degradation, fragmentation, and alteration associated with dewatering, road construction and maintenance, mining, and grazing; (2) the blockage of migratory corridors by dams or other diversion structures; (3) poor water quality; (4) incidental harvest; (5) entrainment

15

(a process by which aquatic organisms are pulled through a diversion or other device) into diversion channels; and (6) introduced nonnative species. *Id.*

61.     The Service designated critical habitat for bull trout in 2010. 75 Fed. Reg. 63,898 (Oct. 18, 2010). The primary conservation role of bull trout critical habitat is to support viable core area populations that reflect the overall structure of the metapopulation.

62.     The Service developed a recovery plan for bull trout in 2015 ("Recovery Plan").

63.     In the process of developing the Recovery Plan, the Service classified 109 "core areas" currently occupied by bull trout based on their importance to the species' survival and recovery.

64.     The Recovery Plan distinguishes two types of core areas for bull trout conservation: complex core areas and simple core areas. Complex core areas contain multiple local bull trout populations, include both migratory and resident bull trout, and include diverse patterns of connected spawning and rearing and foraging, migratory, and overwintering habitats. Simple core areas are smaller, isolated habitats that typically contain a single population, may not include foraging, migratory, and overwintering stream habitat, and may include only the resident life history form or a very simple migratory pattern.

65.     The Columbia Headwater Recovery Unit ("Recovery Unit") has 163 local bull trout populations within 35 core areas spanning Idaho, Washington, and Montana, and includes 15 complex core areas and 20 simple core areas.

66.     The Lake Pend Oreille Core Area ("Core Area") is the largest, most diverse complex core area in the Recovery Unit. Due to its complexity, the Core Area is typically described in three parts (A, B, and C) that are largely disconnected from each other by dams. Core Area B includes Lake Pend Oreille and its tributaries, including Trestle Creek.

16

67.     The Recovery Unit Implementation Plan identifies upland/riparian land use and management as the single unmanaged threat to Core Area B.

68.     Habitat connectivity is essential for the conservation and recovery of bull trout because migration facilitates gene flow among local populations when individuals from different local populations interbreed, or stray, to non-natal streams, and extirpated populations have the potential to become reestablished by migrating bull trout.

69.     Migratory corridors link seasonal habitats for all bull trout life histories. For example, in Montana and northern Idaho, migratory (allacustrine) bull trout make extensive migrations in the Flathead River system, and migratory bull trout in the Pend Oreille River drainage make complex post-spawning migrations.

## III.     The Project Area

### A.     Lake Pend Oreille

70.     Lake Pend Oreille is the largest and deepest natural lake in Idaho, located in Bonner County.

71.      Dams effectively isolate Lake Pend Oreille, with the Cabinet Gorge Dam controlling inflow from the Clark Fork River and the Albeni Falls Dam controlling outflow into the Pend Oreille River. The manipulation of Albeni Falls Dam discharges cause seasonal lake level fluctuations that have altered the hydrology and morphology of the lake's tributary streams. The water level of Lake Pend Oreille fluctuates by 7.5 to 11.5 feet annually with the summer pool level being higher than the winter pool.

72.     This year, the drawdown of Lake Pend Oreille to its winter level will begin September 18, 2022, but full winter drawdown will not begin until October 1, 2022. Lake Pend Oreille is expected to be at its winter elevation on November 15, 2022, at the earliest. *See* Lakes

Commission, *Lake Pend Oreille/Pend Oreille River*, available at
https://lakescommission.wordpress.com/lake-levels/.

73.     Due to its depth and size, Lake Pend Oreille provides excellent cold-water habitat
for bull trout and supports a quality forage fish community. The bull trout population in Lake
Pend Oreille basin is relatively robust at around 12,000 fish. This is largely due to lake's high-
quality foraging, migratory, and overwintering habitat for bull trout and because the tributaries
provide ideal spawning and rearing habitat. Bull trout numbers in the basin were undoubtedly
higher before Cabinet Gorge Dam and Albeni Falls Dam were constructed, as the dams
disconnect large portions of habitat and prevent bull trout from migrating in and out of the basin.

###     B.     Trestle Creek Watershed

74.     Trestle Creek is a tributary of Lake Pend Oreille within bull trout critical habitat
Core Area B and enters the lake approximately three miles northwest of Hope, Idaho.

75.     Trestle Creek is a keystone spawning ground for bull trout and has among the
highest number of documented redds of all the lake's tributaries, historically supporting 10 to 54
percent of redds surveyed in Lake Pend Oreille and the lower Clark Fork River.

76.     The downstream-most segment of Trestle Creek has frequently had the highest
number of bull trout redds than any other stream in the basin. There were 171 bull trout redds in
Trestle Creek in 2021, representing approximately 39 percent of all redds counted in the Lake
Pend Oreille basin that year.

77.     The North Branch splits off from mainstem Trestle Creek approximately one mile
upstream from Lake Pend Oreille, within the downstream-most segment of Trestle Creek, which
has consistently supported the highest number of bull trout redds within the basin. Scientific

reports suggest that Trestle Creek recently had a different or secondary outlet in the current location of a culvert that empties the North Branch into the lake.

78.     Bull trout use the North Branch as a migration corridor between spawning grounds in Trestle Creek and Lake Pend Oreille, and juvenile bull trout rear and forage in Trestle Creek and the North Branch after emerging from redds in Trestle Creek. The North Branch also provides important forage habitat for bull trout of all ages.

79.     Peak bull trout spawning in Trestle Creek occurs in September each year. Because bull trout spawn multiple times in their life cycle, bull trout of multiple life stages use Trestle Creek and the North Branch throughout the year.

80.     Juvenile bull trout rear for up to five years in Trestle Creek and the North Branch before they out-migrate to Lake Pend Oreille. Age-zero bull trout typically out-migrate into the lake from April to September, with the majority out-migrating in the spring during high flows. Age-one and older juvenile bull trout out-migrate to the lake from April through December, with most migrating both in the spring during high flows and in the fall once water temperatures decrease and seasonal rains increase.

81.     Annual bull trout redd counts in Trestle Creek and the Lake Pend Oreille basin have been trending downwards since 2006 and are currently below the previous 10-year average.

III.    **The Project**

A.    **The Proposed Idaho-Club Lakeside Residential Development and Marina**

82.     The Project consists of construction of a marina, marina support facilities, bridges, and roads where Trestle Creek and the North Branch meet Lake Pend Oreille.

83.     The Project will also simultaneously construct new large single family private residences and supporting infrastructure along the banks of Trestle Creek and the North Branch—*i.e.*, the private residential development.

84.     The marina support buildings, private residential development, and additional supporting infrastructure for residences including a pavilion, bridges, and roads, will be built on top of, on the banks of, or near Trestle Creek and the North Branch, along Lake Pend Oreille.

85.     The Project will demolish existing small boat docks and the defunct boat ramp of an abandoned marina to construct two new, enlarged marinas, including a "North Dock Area" and "South Dock Area" with a combined total of 124 boat slips and a widened boat ramp situated in an area critical to bull trout spawning, rearing, migration, and foraging.

86.     The Project will also redirect the lower North Branch and conduct certain "restoration" activities in the upper North Branch and portions of mainstem Trestle Creek.

87.     Demolition of the existing abandoned marina at the mouth of the North Branch to construct the North Dock Area will entail use of heavy equipment to remove a handful of defunct boat slips, docking, a small boat ramp, and other related structures, as well as removing the piles for the existing docks and slips either by pulling them out or cutting them at their base and leaving them in place.

88.     Constructing the North Dock Area marina will involve building a new fixed dock system with 105 boat slips, a double-wide concrete boat ramp measuring 20-feet by 100-feet in length, a 600 square foot floating dock with an attached pump station for boat septic tank sewage disposal, a 160 square foot ramp, and a 250 square foot fixed dock.

89.     Below are the final design plans for the North Dock Area of the Project as authorized by the Corps, the private residential development, and additional infrastructure.

20



90.     Dock installation in the North Dock Area will involve pile driving up to 410 steel 10-inch piles over 6 to 8 weeks at a rate of 16 piles per day using both vibratory and impact pile drivers.

91.     To create the enlarged open water area that will accommodate boat traffic in the North Dock Area's enlarged marina, the Project will completely eliminate a small island and excavate 1,080 cubic yards of additional material near the mouth of the North Branch.

92.     For reference, one large dumpster (18 feet by 7.5 feet by 4 feet) is approximately 20 cubic yards. Therefore, the Project will remove approximately 54 large dumpsters to eliminate a small island to make room for the North Dock Area marina.

93.    The Project will also eliminate an "upland island" to create new upland areas and new shoreline by excavating 14,000 cubic yards of material (700 dumpsters full) and filling in a small backwater area of the lake with 8,500 cubic yards of material (425 dumpsters full).

94.    The Project also plans to construct a beach on Lake Pend Oreille by depositing "supplemental sand" along 250 linear feet of shoreline at the north end of the North Dock Area.

95.    The Corps' permit for the Project also authorizes construction of a new "South Dock Area" along the shoreline of Lake Pend Oreille, which was constructed between the winter of 2020 and the spring of 2021, as shown below.



96.     Construction of the South Dock Area entailed fortifying an existing 8-foot by 100-foot breakwater and replacing existing boat docks with a new dock system with 19 boat slips and additional residential homesites.

97.     In total, the Project's dock and walkway areas for both the North and South Dock Areas will cover Lake Pend Oreille with a total of 20,158 square feet of docking.

98.      Before construction of the North Dock Area marina begins, the Project plans to reroute the North Branch of Trestle Creek so that its outfall no longer connects to Lake Pend Oreille at the proposed North Dock Area marina site but, instead, connects to the mainstem Trestle Creek before emptying into Lake Pend Oreille.

99.     Though the design plans for rerouting the North Branch are not finalized yet, as discussed *infra* at ¶¶ 105-111 and ¶¶ 145-149, it may entail excavating a new stream channel, dewatering the existing channel, installing a screen to exclude fish from the new channel while splitting the flow between the existing and new channels, moving the screen to exclude fish from entering the existing channel, and conducting various "fish salvage" activities, including electrofishing to remove juvenile and adult bull trout.

100.    The Project's "restoration" activities, though not yet finalized, will generally consist of creating new in-channel pools in the North Branch, altering the elevation of the North Branch, reestablishing floodplain vegetation, and removing culverts.

101.    The Project may conduct "fish salvage" in the North Branch and in an existing beaver dam pool present in the North Dock Area and dewater up to 2,000 linear feet of stream channel and diversion according to the yet-undeveloped final design plan.

102.    In sum, the permit allows the Project to permanently discharge 8,500 cubic yards of native upland material, 404 cubic yards of "riprap" rock, and 38 cubic yards of concrete, and

temporarily discharge 33 cubic yards of rock into Lake Pend Oreille and Trestle Creek. The permit also allows the Project to excavate 15,080 cubic yards (754 dumpsters) of material and will disturb approximately 3,000 linear feet of shoreline in Lake Pend Oreille and remove one island, portions of another island, and portions of a peninsula, as shown below.



*Figure 2: Proposed non-lakeward dredge and fill locations.*

### B.     Permit Application, NEPA Review, and ESA Consultation History

103.    Due to the Project's effects on waters of the United States protected by federal law, the developer applied to the Corps in 2007 for a permit under section 404 of the Clean Water Act and section 10 of the Rivers and Harbors Act of 1899 to construct the North Dock Area and South Dock Area and to reroute the North Branch. Joint Application and Supporting Documents for Pend Oreille Bonner Development, LLC, The Idaho Club-Lakeside Project, Trestle Creek Area, Bonner County, ID, September 2007 ("2007 Application").

104.    The 2007 Joint Application contained a biological evaluation and disclosed that the developer planned to excavate the existing North Dock Area marina during low water in Lake Pend Oreille (beginning November 1) —*i.e.*, when bull trout spawn in Trestle Creek—and planned to complete all other Project work, including pile driving, dock construction, and bridge construction, in the spring and summer—when bull trout are out-migrating to the lake.

105.    The 2007 Joint Application included the North Branch Trestle Creek Restoration Project Supplemental Design Report ("2007 Design Plan") prepared by River Design Group, Inc.

106.    The 2007 Design Plan describes the phased process for dewatering the North Branch when there is water flowing in it during construction and also includes specifications for constructing and rerouting the North Branch, which allow construction equipment to cross the creeks up to nine times before requiring installation of a temporary culvert to divert stream flows and describe the requirements for constructing "cofferdams" for temporary diversion channels.

107.    A cofferdam is a temporary structure designed to keep water and/or soil out of a construction work environment. Cofferdams are typically built by driving sheet piling around the work site and placing seal concrete into the bottom to prevent water seeping underneath the piling. Once built, the water is pumped out to facilitate working "in the dry."

108.    The 2007 Design Plan specifies that the North Branch will be moved into a lined diversion for up to four months while the rerouting activities occur, an action that will likely increase stream temperatures.

109.    The Project's "fish salvage" activities, as described in the 2007 Design Plan, involve electrofishing to remove out-migrating juvenile bull trout from the existing channel of the North Branch and from a pool created by a beaver dam in the proposed North Dock Area.

Captured fish will be held in five-gallon buckets, or similar containment, and transported to a site where they will be released.

110.    According to the 2007 Design Plan, once the electrofishing "fish salvage" actions are complete, the existing channel of the North Branch will be plugged behind the screen, and the existing channel of the North Branch will be dewatered and deconstructed.

111.    The 2007 Design Plan also specifies that after the existing channel is plugged, beaver dams will be removed from the area of the proposed North Dock Area marina and the beaver dam pool will be dewatered.

112.    The 2007 Joint Application did not seek any permits from the Corps for the upland development portions of the Project, including private residences, marina support facilities, bridges, roads, and supporting infrastructure for residences.

113.    In 2009, the Corps issued a Clean Water Act section 404 permit for the North Dock Area, South Dock Area, and North Branch portions of the Project and initiated consultation with the Service under section 7 of the ESA regarding the Project's impacts on bull trout and bull trout critical habitat. The Corps determined that the Project was not likely to adversely affect bull trout or critical habitat, and the Service concurred with the Corps' assessment, thus avoiding formal consultation and the need by the Service to issue a Biological Opinion.

114.    In 2012, prior to any Project construction, the Corps requested reinitiation of section 7 consultation with the Service because the developer had requested a five-year extension for the section 404 permit. The Service again concurred with the Corps' assessment that "the 5-year extension 'may affect, but is not likely to adversely affect' bull trout and its critical habitat."

115.    When the five-year 404 permit extension expired and construction did not begin in 2018, the developer applied to the Corps for a three-year 404 permit extension and the Corps again requested concurrence from the Service.

116.    The Service again concurred in October 2018 that extending the Project's timeline with a new 404 permit extended through 2020 did not change its effects analysis that "the Project 'may affect but is not likely adversely affect' bull trout and its designated critical habitat."

117.    The Corps requested public comments the next month, and on December 28, 2018, ICL submitted comments objecting to the Project on the grounds that it requires preparation of an EIS because of its likelihood of public controversy and cumulative impacts.

118.    On November 12, 2019, the Corps issued an Environmental Assessment and Statements of Findings for the Project. The Environmental Assessment and Statements of Findings concluded that Project's effects were not sufficiently significant to warrant preparation of an EIS and stated that the Service concurred with the Corps' determination that the Project "may affect, but is not likely to adversely affect bull trout, and will not adversely affect bull trout critical habitat."

119.    On November 18, 2019, the Corps issued a Permit to "Construct the Trestle Creek Marina Project on Lake Pend Oreille and the North Fork of Trestle Creek" (NWW-2007-001218) ("Permit").

120.    The Permit states: "The stream channel restoration of the lower section of North Fork Trestle Creek shall follow the plan titled 'North Branch Trestle Creek-Idaho Club Supplemental Design Report,' developed for the permittee by River Design Group, Inc., dated September 8, 2007,"—*i.e.*, the 2007 Design Plan.

121.    On May 5, 2021, the Center and ICL sent a notice of intent to sue to the Service, the Corps, the Secretary of the U.S. Department of the Interior, and the developer for alleged violations of the ESA.

122.    In response, on July 2, 2021, the Service recommended that the Corps reinitiate section 7 consultation on the Project because new information indicated that the continued degradation of the North Branch and subsequent impacts to bull trout spawning and rearing habitat had resulted in a new environmental baseline that needed to be reanalyzed.

123.    The Corps requested reinitiation of section 7 consultation on July 20, 2021.

124.    Throughout the next several months, the Corps and the Service worked together to draft a biological assessment and terms and conditions to incorporate into the forthcoming Biological Opinion.

125.    In October, the Service reported that it observed significant water flowing in the North Branch in mid-October—when the Corps assumed the North Branch to be dry—as well as a beaver dam creating a large pool in the proposed North Dock Area.

126.    In December 2021, the Corps informed the Service that the developer could not acquire an updated project design plan for rerouting and restoring the North Branch in time to consult on it as part of the proposed action.

127.    Rather than waiting for a final updated project design, the Corps proposed to use the terms and conditions of the incidental take statement in the forthcoming Biological Opinion to define and attempt to constrain the potential impacts of rerouting and restoring the North Branch so that the proposed action could be consulted on prior to developing new plans. The Service agreed.

128.    In March 2022, the Service received the final Biological Assessment from the Corps, which concluded that the Project may affect and is likely to adversely affect bull trout and bull trout critical habitat and requested formal consultation with the Service. This was the first time that the Corps acknowledged that the Project would harm bull trout and/or their critical habitat.

129.    The Biological Assessment did not analyze the effects of constructing private residences, marina support facilities, bridges, roads, and supporting infrastructure for residences because the Corps determined the residential development could be constructed regardless of the issuance of a permit from the Corps.

130.    The Biological Assessment acknowledged that the final designs for rerouting and "restoring" the North Branch have not been completed but disclosed that the redirection of the North Branch "may require in-water work in the [North Branch]."

131.    The Service acknowledged receipt of the Corps' final Biological Assessment and request for formal consultation on April 1, 2022.

**C.    The Service's Unlawful Biological Opinion and "No Jeopardy" Decision**

132.    On August 12, 2022, the Service issued its final Biological Opinion concluding that the Project would not jeopardize the continued existence of bull trout and would not destroy or adversely modify designated critical habitat for bull trout and issued an Incidental Take Statement authorizing take of bull trout from Project activities—*i.e.,* the "no jeopardy" decision.

133.    The Biological Opinion finds that the Project will, in fact, "take" bull trout in the form of injury (wound), capture, or death (kill), by "fish salvage"—*i.e.*, electrofishing—and fish handling associated with dewatering up to 3,000 linear feet of bull trout habitat, including rerouting the North Branch and removing the beaver dam present in the proposed North Dock

Area. Yet, in several ways, the Biological Opinion and accompanying Incidental Take Statement fail to address to full scope of Project-related impacts.

134.    The Biological Opinion defines the action area to include 154 acres of the construction activities and an additional 1,000-foot buffer in all directions.

135.    The Biological Opinion states that the "proposed action is to construct a new marina at the site of an abandoned marina so that it can operate when lake levels are sufficient for watercraft activity[,] . . . reroute and restore then North Branch Trestle Creek[,] and restore riparian areas of all branches of Trestle Creek on the property."

136.    The Biological Opinion does not acknowledge or disclose the Project's South Dock Area.

137.    The Biological Opinion's environmental baseline analysis does not include the South Dock Area which was completed in 2020-2021 and is a significant aspect of the Project.

138.    The Biological Opinion mistakenly assumes that rerouting the North Branch will be done "in the dry." Contrary to this mistaken assumption, Project activities including dewatering, electrofishing, and diverting the North Branch will likely be happening at the same time that adult bull trout are spawning in Trestle Creek and juveniles are out-migrating to Lake Pend Oreille through the Project area.

139.    The Biological Opinion determined that construction of private residences, marina support facilities, bridges, roads, and supporting infrastructure for residences are private actions that are reasonably certain to occur and that will have "multiple potential impacts to water quality and bull trout individuals that would not occur if the action were not developed." Yet the Biological Opinion fails to analyze the effects that the construction of private residences, marina support facilities, bridges, and roads will have on bull trout and bull trout critical habitat.

140.    The Biological Opinion states that the county permit for the private residential development identifies a sewage drain field that will be installed for the private residences. However, the Biological Opinion does not analyze the cumulative effects of the sewage drain field on bull trout and bull trout critical habitat.

141.    The Biological Opinion states that runoff from impervious surfaces could affect bull trout and bull trout critical habitat "to some degree" but does not analyze the cumulative effects of runoff from impervious surfaces on bull trout and bull trout critical habitat.

142.    The Biological Opinion states that the use of herbicides at the private residences "may have impact on the growth and behavior of bull trout and prey species abundance" but does not analyze the cumulative effects of the use of herbicides on bull trout and bull trout critical habitat.

143.    The Biological Opinion states that noise and visual disturbances from "gatherings, celebrations, and fireworks" may "deter or disrupt migrations to some degree" but does not analyze the cumulative effects of noise and visual disturbances from these events on bull trout and bull trout critical habitat.

144.    Additionally, the Biological Opinion acknowledges that the Project authorizes a "beach renovation" that will involve adding "supplemental sand" to a 10-foot shoreline north of the North Dock area and in bull trout critical habitat along Lake Pend Oreille. However, the Biological Opinion does not analyze the effects of the "beach renovation" on bull trout or on the aquatic lakeshore environment designated as bull trout critical habitat.

145.    The Biological Opinion concedes that the final design plan for redirecting and "restoring" Trestle Creek and the North Branch has not been disclosed to the Service and is still

not finalized. Consequently, the Biological Opinion does not (and could not) analyze the efficacy and impact of such restoration efforts.

146.    The Service states in the Biological Opinion that "[w]hile final designs for the restoration of [North Branch] are still in development at this time, preliminary plans located in appendix C of the [Biological] Assessment are used for approximate detail in all restoration discussions in this opinion (Assessment, p. 14)." Appendix C of the Biological Assessment is the 2007 Design Plan.

147.    The Service further concedes that the effects of moving the North Branch can only be assessed by the Project's conservation measures and the 2007 Design Plan. Despite this concession, the Service admits that the 2007 Design Plan "does not represent a final design that can be used to assess the impacts of the proposed action." Nevertheless, the Service bases its analysis of the effects of the Project on the 2007 Design Plan, which implements outdated methods and structures to reroute North Branch.

148.    An updated Project design plan will necessarily implement best practices for stream rerouting activities and construction, which have changed in the 15 years since the 2007 Design Plan.

149.    Therefore, the Project's new design plan will implement different plans than those that the Service analyzed in the Biological Opinion to conclude "no jeopardy" to bull trout.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### THE BIOLOGICAL OPINION VIOLATES THE ESA AND APA

### The Service failed to provide a lawful cumulative effects analysis.

150.    Section 7 of the ESA requires a biological opinion prepared by the Service to "evaluate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(3).

151.    In the context of the ESA, cumulative effects "are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02.

152.    Therefore, private activities that are reasonably certain to occur in the Project area must be included in the cumulative effects analysis.

153.    The Service concedes that construction of private residences, marina support facilities, bridges, roads, and supporting infrastructure for residences are reasonably certain foreseeable private actions to occur in the action area.

154.    The Service concedes that the private residences will have "multiple potential impacts to water quality and bull trout individuals that would not occur if the action were not developed."

155.    The Service failed to analyze the effects of the private residences, marina support facilities, bridges, roads, and supporting infrastructure for residences; the construction of these elements, including, but not limited to, effects from runoff from impervious surfaces; herbicide use; noise; and visual disturbances on bull trout and bull trout critical habitat.

156.    The Service's failure to analyze the impacts to bull trout that will result from the cumulative effects of the private actions, in conjunction with the Project activities analyzed in the Biological Opinion, renders the Service's analysis arbitrary and capricious and results in an invalid no-jeopardy conclusion.

## SECOND CLAIM FOR RELIEF
## THE BIOLOGICAL OPINION VIOLATES THE ESA AND APA

**The Service failed to provide a detailed discussion of effects of the entire agency action.**

157.    The ESA and APA require the Service to analyze effects of the action on listed species. 50 C.F.R. § 402.14(g)(3)(4); 5 U.S.C. § 706(2)(A).

158.    The ESA requires the Biological Opinion to include a detailed discussion of effects of the entire action. 50 C.F.R. § 402.14(h)

159.    The action area for the Project includes the South Dock Area, which was completed between winter 2020 and spring 2021.

160.    The South Dock Area of the Project, which permitted by the Corps and included actions that would affect bull trout and modify bull trout critical habitat, is therefore part of the environmental baseline of the Project area.

161.    The Service's failure to include the impacts of the South Dock Area of the Project in the environmental baseline is a failure to analyze the effects of the entire agency action when added to the baseline and provide a detailed discussion of effects of the action on bull trout.

162.    The Project authorizes a "beach renovation," which entails altering bull trout critical habitat, specifically the Lake Pend Oreille shoreline aquatic environment.

163.    The Service's failure to analyze the effects of altering the lake shoreline aquatic environment on bull trout and bull trout critical habitat is a failure to adequately analyze the effects of the Project on designated critical habitat for bull trout.

164.    The Project requires rerouting the North Branch—a bull trout rearing, foraging, and migration creek—to accommodate the residential development and North Dock Area marina.

34

165.    The Service concedes that the plan to reroute and "restore" the North Branch is not finalized.

166.    The Service's reliance on the outdated 2007 Design Plan, which ultimately will not be implemented, in an attempt to "approximate" the effects of rerouting the North Branch on bull trout and bull trout critical habitat is arbitrary and capricious.

167.    The Service's assumption that redirecting the North Branch will be done "in the dry" is incorrect and runs counter to the evidence before the agency.

168.    Therefore, the Service provided an inadequate and unlawful analysis of effects of the action because the Biological Opinion did not analyze the final design plan for rerouting and "restoring" the North Branch.

169.    As a result, the Service failed to properly analyze the effects of the entire action and provide a detailed discussion, and, thus, its "no jeopardy" decision is arbitrary and capricious and in violation of the ESA.

### THIRD CLAIM FOR RELIEF
### THE BIOLOGICAL OPINION VIOLATES THE ESA AND APA

#### The Service improperly relied on uncertain mitigation measures.

170.    To determine whether an action will jeopardize a listed species or adversely modify its habitat, the Service may only rely on proposed mitigation measures if they have clear, definite commitments of resources and are under federal control or otherwise reasonably certain to occur. Mitigation measures that refer only to generalized contingencies or gesture at hopeful plans and do not describe, in detail, the action agency's plan cannot support a conclusion that an action will not jeopardize a species or impair its critical habitat.

171.    The Biological Opinion relies on 2007 Design Plan to offset the negative impacts of the marina project and ensure against jeopardy to bull trout and the destruction or adverse

modification of bull trout critical habitat. However, the Project will not implement the 2007 Design Plan but rather will implement a design plan that has not been finalized and that the Service did not analyze or include in the Biological Opinion.

172.    Therefore, the yet-to-be-determined design plan lacks the specificity, deadlines, and otherwise enforceable obligations required for mitigation sufficient for the Service to conclude "no jeopardy" to bull trout.

173.    The Service's reliance on the unknown design plan is a reliance on uncertain and unknown mitigation measures and renders the Service's "no jeopardy" determination invalid and the Biological Opinion arbitrary and capricious.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF NEPA AND THE APA**

**The Corps failed to conduct a supplemental environmental analysis of the impacts of the Project, including lethal take of bull trout, based on significant new information.**

174.    NEPA requires a federal agency to, "to the fullest extent possible," prepare "a detailed statement on . . . the environmental impact" of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i); *see also* 40 C.F.R. §1500.2

175.    The agency must be alerted to new information that may alter the results of its original environmental analysis and continue to take a hard look at the environmental effects of its planned action, even after a proposed action has received initial approval.

176.    The agency must prepare a supplemental environmental analysis when there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii).

177.    If new information shows that the action will affect the environment in a significant manner or to a significant extent not already considered, a supplemental environmental analysis must be prepared.

178.    Here, since the Corps' issued its Environmental Assessment and Statement of Findings, the Corps and the Service have recognized that "continued degradation of the North Fork of Trestle Creek and subsequent impacts to bull trout spawning and rearing habitat has resulted in a new environmental baseline that should be reanalyzed" and reinitiated section 7 consultation to determine the effects of the action on bull trout and bull trout critical habitat.

179.    As a result, the Corps and the Service changed their initial determination regarding the effects of the action on bull trout and bull trout critical habitat from "not likely to adversely affect" to "likely to adversely affect." The Biological Opinion, although inadequate, finds that the Project will harm bull trout and critical bull trout in a number of ways, and relies on mitigation measures that have never been analyzed under NEPA.

180.    Therefore, there is sufficient new information to show that the Project will affect the quality of the human environment in a significant manner or to a significant extent not already considered. This information could have a substantial bearing on the Corps' consideration under the Clean Water Act of whether the "public interest" supports authorizing the highly destructive actions at issue. 33 C.F.R. § 320.4(a).

181.    The Corps' failure to prepare a supplemental environmental assessment, environmental impact statement, or any other supplemental NEPA analysis violates NEPA and constitutes agency action unlawfully withheld and/or unreasonably delayed, in violation of the APA, 5 U.S.C. § 706(1), and/or constitutes agency action that is arbitrary and capricious or not

otherwise in accordance with law and in contravention of procedure required by law, in violation of the APA, 5 U.S.C. 706(2).

## **RELIEF REQUESTED**

For the above stated reasons, Plaintiffs request that this Court award the following relief:

    A.  Declare that the Project Biological Opinion violates the ESA and the APA;

    B.  Vacate the Biological Opinion and remand to the Service to reinitiate consultation under section 7 of the ESA;

    C.  Order the Corps to prepare supplemental NEPA analysis;

    D.  Enjoin the Corps' and the Service's authorization of Project activities;

    E.  Award Plaintiffs their litigation costs, expenses, expert witness fees, and reasonable attorney fees under the ESA and/or EAJA; and

    F.  Grant Plaintiffs such further and additional relief as the court may deem just and proper.

Respectfully submitted this 25th day of August, 2022,

*/s/ Andrea Zaccardi*
Andrea Zaccardi (ISB # 8818)
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
(303) 854-7748
azaccardi@biologicaldiversity.org

Kristine M. Akland (MTB # 37818)
*pro hac vice admission pending*
Center for Biological Diversity
P.O. Box 7274
Missoula, MT 59807
(406) 544-9863
kakland@biologicaldiversity.org

Margaret E. Townsend (OSB # 144463)
*pro hac vice admission pending*
Center for Biological Diversity
P.O. Box 11374

Portland, OR 97211-0374
(971) 971-6409
mtownsend@biologicaldiversity.org